IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Criminal Action No. 10-67-GMS |
| ) | |
| MARQUIS LOPEZ, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM

**I. INTRODUCTION**

On July 6, 2010, the Grand Jury for the District of Delaware indicted defendant Marquis A. Lopez ("Lopez") for one count of possession with intent to distribute heroin, one count of possession of a firearm in furtherance of a drug trafficking crime, and one count of possession of a firearm by a person prohibited. (See D.I. 14.) Presently before the court is Lopez's Motion to Suppress Evidence. (D.I. 28.) The court held an evidentiary hearing in connection with this motion on December 16, 2010 (see D.I. 37), after which the parties filed proposed findings of fact and conclusions of law (D.I. 39 & D.I. 48). After the hearing and the filing of the parties' briefs, the court decided that an additional evidentiary hearing would be beneficial to further develop the record regarding the use of Global Positioning System ("GPS") devices to track the movements of vehicles that Lopez used during the months leading up to his arrest. The court convened a supplemental evidentiary hearing on March 23, 2011 (see D.I. 58), and the parties then filed supplemental proposed findings of fact and conclusions of law (D.I. 64 & D.I. 65). For the reasons that follow, the court will deny Lopez's motion to suppress.

## II. FINDINGS OF FACT

At the initial evidentiary hearing on December 16, 2010, the United States called three witnesses: Corporal David Diana of the Delaware State Police ("Diana"), Officer David Hamrick, a canine officer in the Wilmington Police Department ("Hamrick"), and Detective Robert Fox of the Wilmington Police Department ("Fox"). Fox was the only witness that the United States called at the supplemental evidentiary hearing on March 23, 2011. Lopez did not call any witnesses at either hearing. After listening to the testimony of the witnesses, the court concludes that the account of the facts provided by Diana, Hamrick, and Fox is credible. The following represents the court's essential findings of fact as required by Rule 12(d) of the Federal Rules of Criminal Procedure.

In November 2009, Fox and his colleagues in the Wilmington Police Department ("WPD") Drug, Organized Crime, and Vice Division received information from a past proven reliable confidential informant about an individual that he knew as "Lope" or "Curly" who was selling heroin within the City of Wilmington. (See D.I. 37 at 42.) After the informant identified a photograph of Lopez as the person he knew as "Lope" or "Curly," the WPD detectives conducted a controlled purchase of heroin from Lopez in the first or second week in November 2009. (See id. at 43.)

During the following months, the WPD investigated Lopez through a number of means. Detective Fox and his colleagues attempted another controlled buy of heroin from Lopez, but the transaction was not completed; Lopez apparently noticed the police conducting surveillance of the area where Lopez was to meet the police informant. (Id. at 43.) Fox's team also conducted physical surveillance of Lopez during this period, and continued to receive information regarding

2

Lopez's movements and drug dealing activities from past proven informants and cooperating sources. (Id.)

Fox and his WPD colleagues also used GPS tracking devices to monitor the movements of the vehicles that they observed Lopez using. During the course of the investigation, GPS devices were placed on five different vehicles at various times: a Ford Crown Victoria, a Volkswagen Jetta, a Honda Odyssey, a BMW 5 series, and a blue Dodge Durango. (D.I. 37 at 46.) The Crown Victoria was registered to Lopez, while the other vehicles were registered to different Hispanic males with addresses in Philadelphia, Pennsylvania. (Id.) The two GPS devices used by the WPD were three-inch by three-inch battery powered units that were magnetically attached to the undercarriages of the tracked vehicles. (D.I. 58 at 18.) The devices were installed on the vehicles while they were parked in a parking lot in the 700 block of Townsend Street in Wilmington, outside the defendant's residence. (Id. at 27.) Once installed, the device allows the detectives to monitor the location of the tracked vehicle by logging onto the website of the tracking device vendor, Covert Track. (Id. at 19-21.) The information collected and logged by the GPS device pertains to the location, speed, and the direction of travel of the tracked vehicle. (See, e.g., id.; D.I. 37 at 49, 51.) At no time did Fox or his WPD colleagues obtain a court order or warrant authorizing installation or use of the GPS devices. (D.I. 58 at 28.)

On June 1, 2010, the detectives installed a GPS tracking device on the blue Dodge Durango.[1] (D.I. 58 at 58.) On the evening of June 2, Fox received a text message from the GPS tracker indicating that the Durango had entered Pennsylvania northbound on Interstate 95. (D.I.

---

[1] Fox's team had also monitored the Durango using a GPS tracking device from April 30 to May 20 of 2010. (See D.I. 58 at 43-48.)

3

37 at 47-48.) Concluding that Lopez was likely heading to Philadelphia to acquire heroin, Fox assembled a team of WPD detectives to conduct a traffic stop of the defendant as he returned to Wilmington. (Id.) Fox also arranged for Hamrick, the drug canine officer, to be available. (Id. at 48.)

Shortly thereafter,[2] the Dodge Durango was observed driving southbound on I-95 past the Philadelphia International Airport. (Id. at 48-49.) Up to this point, the vehicle had been driving between 60 and 65 miles per hour. (Id. at 49.) Fox and his team trailed the defendant as he headed south into Delaware and exited at one of the Wilmington exits. (Id. at 50-51.) Upon exiting, Lopez made "a couple of abrupt turns" and Fox's team lost sight of him. (Id.) The GPS tracker later revealed that the vehicle turned around and drove northbound on I-95 at between 90 and 95 miles per hour. (Id. at 51.)

As it happened, Corporal Diana was on duty and engaged in a "proactive patrol" on I-95 north, near the Harvey Road exit in north Wilmington, at the time Fox's team lost sight of Lopez. Diana was operating a calibrated radar device to monitor northbound traffic and measure the speed of passing vehicles. (Id. at 10.) When Lopez's Dodge Durango passed him, Diana's radar gun showed that it was traveling at 91 miles per hour in a 55 miles per hour zone. (Id. at 11.) Diana activated his emergency lights and initiated a traffic stop of the defendant's car. (Id.)

A video recording of the traffic stop taken by Diana's on-board camera shows that within seconds after he stopped behind the Durango, Diana exited his patrol car and approached the

---

[2] The traffic stop was initiated at 1:03 a.m. on June 3, 2010.

Durango on the passenger side.[3] During the next two minutes, Diana is seen conversing with the vehicle's occupants and occasionally shining his flashlight into the vehicle's interior. The audio on the recording did not pick up what was said during this time, but Diana testified at the hearing as to content of his conversation with the occupants and the court finds his testimony credible.

Diana testified that he observed Lopez and two other individuals in the Durango, and that Lopez was operating the vehicle. (D.I. 37 at 11.) After approaching the vehicle, Diana asked Lopez for identification. (Id. at 12.) Lopez provided Diana with his name but initially[4] said he did not have any form of identification on him. (Id.) The two passengers both furnished driver's licenses to Diana. (Id.) Diana then asked the occupants who owned the vehicle and what their destination was. (Id.) Lopez responded by stating that he owned the vehicle and that they were headed to a club. (Id.) After questioning the other occupants, Diana asked Lopez again who owned the vehicle. (Id. at 12-13.) Lopez then said that his brother owned the vehicle but was unable to elaborate when Diana asked who his brother was. (Id. at 13.) During this conversation, Diana noticed an odor that he concluded, based on his training and experience, was the smell of burnt marijuana. (Id.) At one point, Diana shined a flashlight into the vehicle and noticed what he believed "based on the appearance and consistency, to be green plant-like marijuana" on the front of one of the passenger's shirts. (Id.) The passenger made an unsolicited statement, "It's not weed," and then brushed the substance off his shirt. (Id.) Diana

---

[3] The video recording of the traffic stop was entered into evidence at the suppression hearing as Government Exhibit 1.

[4] Apparently, Lopez later was able to provide Diana with his driver's license, since Diana's testimony indicates that he ran Lopez's license through the DELJIS system when he returned to his patrol car. (See D.I. 37 at 15.)

5

also noticed a strong smell of air freshener in the car, which his training indicated was "consistent with someone who may have contraband in the car, to mask the odor." (Id. at 14.)

Diana then returned to his patrol car to request additional units. (Id.) He ran Lopez's driver's license through the Delaware Criminal Justice Information System ("DELJIS") and saw that Lopez had an extensive criminal history, including drug-related convictions. (Id. at 15.) Shortly thereafter – less than two minutes after Diana first exited his patrol car – plainclothes members of Fox's WPD investigative team arrived on the scene of the traffic stop. (Id.; see also Gov't Ex. 1.) Hamrick and his canine partner, Gocha, arrived within one minute after the plainclothes members of Fox's team arrived on the scene. (See D.I. 37 at 16; Gov't Ex. 1.) Unsurprisingly, Diana surmised at this point that "there was a little more to [the initial traffic stop] than met the eye." (Id. at 15.) Hamrick and Gocha then conducted an external scan of the Durango, during which Gocha gave what Hamrick took to be a positive alert while performing their second (medium-height) pass around the vehicle. (Id. at 31-33.)

Fox and his team then took Lopez and his passengers into custody and transported them to the Wilmington police station. (Id. at 54.) Early on the morning of June 3, the detectives obtained search warrants from a Delaware Justice of the Peace for the Durango. (Id. at 56.) The probable cause affidavit in support of the warrant application included many details regarding the WPD's investigation, including the controlled buy and the events of the traffic stop, but made no mention of the use of the GPS devices or any of the evidence obtained from them. (See Gov't Ex. 5.) The search of the Durango produced approximately 19,500 bags of heroin. (See Gov't Ex. 6 at 39.) The WPD then obtained a search warrant for the defendant's residence, for which the probable cause affidavit again made no mention of the GPS devices. (See Gov't Ex. 6.)

6

## III. CONCLUSIONS OF LAW

Lopez's proposed findings of fact and conclusions of law with respect to his motion to suppress focus on one particular component of the WPD's investigation – the use of GPS tracking devices. The issue of whether the placement and use of such tracking devices constitutes a search under the Fourth Amendment has become increasingly prominent in both federal and state courts in recent years. The Supreme Court recently granted certiorari in *United States v. Jones*, No. 10-1259, to resolve the questions of "[w]hether the warrantless use of a tracking device on respondent's vehicle to monitor its movements on public streets violated the Fourth Amendment" and "whether the government violated respondent's Fourth Amendment rights by installing the GPS tracking device on his vehicle without a valid warrant and without his consent."[5] This court need not, however, address the legal status of GPS tracking in this case. Even if the court were to accept *arguendo* that the placement and use of GPS devices constitutes a search, the court concludes that the evidence seized from Lopez's vehicle and residence in this case are not subject to the exclusionary rule, and thus should not be suppressed.

The Supreme Court held in *Wong Sun v. United States* that not all evidence "is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." 371 U.S. 487-88 (1963). Instead, courts must examine "whether, granting establishment of the primary illegality, the evidence to which . . . objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id.* at 488. The Third Circuit has since restated the *Wong Sun*

---

[5] The Supreme Court's statement regarding the granting of the *certiorari* petition can be seen at http://www.supremecourt.gov/qp/10-01259qp.pdf.

standard as two separate inquiries: (a) the proximity of an initial illegal custodial act to the acquired evidence; and (b) whether circumstances subsequent to an illegal search or seizure provided a cause so unrelated to that initial illegality that the acquired evidence may not reasonably be said to have been directly derived from, and thereby tainted by, the illegal acts. *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) (citing *Pennsylvania ex rel. Craig v. Maroney*, 348 F.2d 22, 29 (3d Cir. 1965)). The first inquiry assesses the degree of attenuation between illegal police conduct and the evidence allegedly derived from it, while the second examines whether an independent source exists for that evidence. *Id.* at 100. Under the second inquiry, "evidence that was in fact discovered lawfully, and not as a direct or indirect result of illegal activity, is admissible." *Id.* (quoting *United States v. Herrold*, 962 F.2d 1131, 1140 (3d Cir. 1992)).

Here, the court concludes that the search of the Durango and the subsequent search of Lopez's residence were sufficiently attenuated from the use of GPS tracking that the evidence obtained during those searches is not tainted by the use of GPS tracking.[6] First, despite the defendant's assertion that the GPS surveillance "corrupted the entire investigation" into his activities, the court concludes that the GPS devices were only one component of a wide-ranging investigation into Lopez's activities. As detailed in the findings of fact, the investigation included controlled buys, direct physical surveillance, and receiving information from confidential informants and cooperating sources over a period of several months. The evidence

---

[6] The court assumes without deciding that the use of GPS tracking constituted a "search" for Fourth Amendment purposes.

in the record simply does not support the conclusion that the GPS tracking was so pervasive and integral that it corrupted the entire investigation.

Indeed, the probable cause affidavit submitted in support of the warrant made no mention of the GPS tracking, nor did it describe the surveillance of the Durango (which apparently was made possible by GPS tracking) on the morning of June 3. Instead, the affidavit detailed the numerous other aspects of the months-long investigation, and described the positive drug canine sniff that was conducted after Diana pulled Lopez's vehicle over for speeding – an act that, for the reasons explained below, was itself independent of the GPS tracking. The facts laid out in the affidavit are more than sufficient to establish probable cause to conduct the search of Lopez and the Durango that was carried out on the morning of June 3.

Furthermore, neither the GPS tracking device nor the broader Lopez investigation ultimately led to the stop of the Dodge Durango and Lopez's arrest on the morning of June 3. While the GPS device initially alerted Fox that Lopez was traveling toward Philadelphia and helped his team establish visual surveillance of Lopez's Durango on the night of his arrest, Fox's team lost sight of Lopez's vehicle before they were able to affect a search or seizure. In the end, it was Lopez's speeding that led Diana to initiate the traffic stop. There is no evidence that Diana, a state trooper, had any knowledge of the WPD's investigation into Lopez's activities, much less the covert surveillance that Fox was conducting on the morning of June 3.

Even if the court were to assume that it was Lopez's detection of the Fox's surveillance that led him to turn around and head in the opposite direction on I-95, and that the GPS tracking device was a "but for" cause of Lopez's speeding and Diana's subsequent traffic stop, Lopez's decision to drive 91 miles per hour in a 55 miles per hour zone can hardly be attributed to the

WPD detectives. Indeed, since Fox's team lost sight of the Durango before the detectives could initiate a stop, "if it were not for the entirely fortuitous presence of Trooper Diana, the defendant may have entirely escaped the WPD surveillance team . . . ." (See D.I. 64 at 41.) Consequently, the court concludes that Diana's decision to initiate the traffic stop was sufficiently attenuated from the WPD's use of GPS tracking that the stop cannot reasonably be characterized as derived from or tainted by the GPS tracking.

Once Diana initiated the traffic stop, his observations during the minutes before Fox's team arrived on the scene provided probable cause independent of the GPS tracking to search Lopez and the Durango he was driving. It is well settled that when a law enforcement officer has probable cause to believe that an automobile contains contraband, that officer may search the vehicle even without a warrant under the "automobile exception" to the warrant requirement. *See, e.g., United States v. Ross*, 456 U.S. 798, 824 (1982). Moreover, "[i]t is well settled that the smell of marijuana alone, if articulable and particularized, may establish . . . probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006). Diana testified that that he detected an odor that he believed from his training and experience to be burnt marijuana when he approached the Durango during the traffic stop. Additional observations that Diana made during the course of the stop provide further support for a finding of probable cause to search the vehicle, including: 1) the inconsistencies in Lopez's explanation both of the vehicle's destination and the vehicle's ownership; 2) the smell of air freshener; 3) Diana's observation of what he believed to be "green plant-like marijuana" on the shirt of one of Lopez's passengers; and 4) that passenger's unsolicited statement that the substance was not "weed." None of these facts were tainted by the WPD's use of GPS tracking, nor can they be characterized as substantially derived

10

from Fox's investigation. The positive alert by the drug canine during a sweep of the Durango,[7] which ultimately was detailed in the affidavit in support of the search, further strengthens a finding of probable cause.

Certainly, taken together, these facts provided probable cause to search the Durango for contraband, and Diana and the detectives could have, had they been so inclined, conducted a search of the vehicle on the side of the road without even obtaining a warrant. In any case, since Fox's team did ultimately obtain a warrant based on an affidavit of probable cause that made no mention at all of GPS tracking after a traffic stop that was made independently of Fox's investigation, the search of Lopez, the Durango, and (ultimately) Lopez's residence are not tainted by the WPD's use of GPS tracking. The court therefore will deny Lopez's motion to dismiss.

## IV. CONCLUSION

For the foregoing reasons, the court hereby denies the defendant's motion to suppress.

Dated: July 6, 2011

CHIEF, UNITED STATES DISTRICT JUDGE

---

[7] Such an exterior drug canine sweep of a vehicle is not itself a "search" for the purposes of the Fourth Amendment. *See, e.g., Illinois v. Caballes*, 543 U.S. 405, 410 (2005) ("A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.").

11

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| Plaintiff, | ) |
| v. | ) Criminal Action No. 10-67-GMS |
| MARQUIS LOPEZ, | ) |
| Defendant. | ) |

## ORDER

For the reasons stated in the court's Memorandum of this same date, IT IS HEREBY ORDERED THAT:

1. The defendant's motion to suppress evidence (D.I. 28) is DENIED.

Dated: July 6, 2011

CHIEF, UNITED STATES DISTRICT JUDGE